# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### At Martinsburg

WESTFIELD INSURANCE COMPANY,
an Ohio Corporation,

        Plaintiff,

v.                              CIVIL ACTION NO. 3:03CV43
                                     Judge W. Craig Broadwater

SCOTT E. PAUGH; and SUSAN K.
PAUGH, husband and wife; and
SMITH-NADENBOUSCH INSURANCE, INC.,

        Defendants,

And

SCOTT E. PAUGH; and SUSAN K.
PAUGH, husband and wife; and
SMITH-NADENBOUSCH INSURANCE, INC.,

        Counterclaim and Third-Party Plaintiffs,

v.

WESTFIELD INSURANCE COMPANY,
an Ohio Corporation,

        Counterclaim Defendant,

And

AARON LEWIS and
NORTH QUEEN AUTO SALES, INC.,
a West Virginia Corporation,

        Third-Party Defendant,

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

On January 24, 2005, and again on January 27, 2005, the above-captioned matter came before the Court for consideration of the parties' cross-motions for summary judgment on an insurance coverage issue. The insurance coverage issue is whether the Paughs have 1 million dollars of uninsured/underinsuerd motorist (UM/UIM) umbrella coverage applicable to a May 29, 2002, motor vehicle accident in which Scott Paugh sustained serious injuries. (Documents #117 and #119). The parties appeared by their respective counsel of record and presented oral arguments in support of their respective memoranda of law. After considering the above, the Court is of the opinion that the Plaintiff Westfield's Motion for Summary Judgment (Document #119) should be **DENIED** and that the Defendant Paughs' Motion for Summary Judgment (Document #117) should be **GRANTED** for reasons hereinafter set forth.

The Paughs' Memorandum in Support of Motion for Summary Judgment against Westfield Insurance Company on Coverage Issue (Document #117) asserts that 22 material facts are not in dispute. Westfield concedes that with one exception,[1] Paughs'

---

[1]Concerning this one exception, Westfield stated:

"With one exception, the Paughs' Statement of Facts summarizes the facts material to summary

Statement of Facts summarizes the facts material to summary judgment on the coverage issues. (Document #125, Page 2). The undisputed material facts asserted by the Paughs were as follows:

1.  The relevant portions of West Virginia Code § 33-6-31(a) and (b) have been in effect at all times material hereto.

2.  In 1992, a declaratory judgment class action lawsuit was filed in the Circuit Court of Kanawha County, West Virginia, styled <u>Franklin S. Fragale, Jr., individually and on behalf of all others similarly situated, v. Westfield Insurance Company</u>, Civil Action No. 92-C-795, which was subsequently removed to the United States District Court for the Southern District of West Virginia and assigned Civil Action No. 2:92-0251. A central issue in the <u>Fragale</u> case was whether an insurance company was required to offer UM/UIM coverage with respect to umbrella policies.

3.  On September 22, 1992, Roger McManus, then vice-president and now president of Westfield, executed an Affidavit which was filed in the <u>Fragale</u> case. This Affidavit represented

judgment on the coverage issue. Westfield's offers of optional umbrella UM/UIM coverage were entirely voluntary until 2001, when W. Va. Code § 33-6-31f expressly required insurers to offer umbrella UM/UIM coverage, but the Paughs mischaracterize Westfield's motivation before 2001." (Document #125, P. 2).

in pertinent part as follows:

> That Westfield has requested, and is again requesting that the [independent insurance agencies which are responsible for the sale of all of its insurance policies in the State of West Virginia] notify all its known West Virginia umbrella/excess insureds that they now have the option of purchasing uninsured and/or underinsured motorist coverage limits, including umbrella/excess limits, to correspond with their liability limits, up to a maximum limit of Six Million Dollars.

4. Following the McManus Affidavit in which Westfield represented that it would offer its umbrella policyholders the option to purchase UM/UIM coverage, the <u>Fragale</u> case was dismissed upon the agreement of the parties.

5. Since the McManus Affidavit in 1992, it has been Westfield's stated policy to require its agents to offer UM/UIM coverage in amounts up to the liability limits on umbrella policies.

6. Not only was it Westfield's stated policy to offer UM/UIM coverage to persons purchasing umbrella policies, but Westfield at various times has also represented that it was required to do so by West Virginia law. These representations were made to the office of the West Virginia Insurance Commissioner as well as to some of its West Virginia agents.

7. In November 1993, Westfield, through Smith-Nadenbousch, sold the Paughs a Personal Auto Policy having

liability limits of $500,000, at which time the Paughs elected UM/UIM coverage limits of $500,000.

8. Thereafter, Dailey recommended that the Paughs purchase an umbrella policy from Westfield.

9. During the application process, Dailey, a vice-president and producer for Smith-Nadenbousch, represented to Susan Paugh that in order to get a Westfield Personal Umbrella Policy, the Paughs were required to reject UM/UIM coverage.

10. In reliance on Dailey's representation, the Paughs signed Westfield Form AC 970.

11. Smith-Nadenbousch, through Stewart M. Borger, its president, CEO, chairman of the board, and Rule 30(b)(6) Corporate Representative, also admits that the Paughs were required to reject excess uninsured and underinsured coverage during the application process in order to get the Umbrella Policy from Westfield.

12. Smith-Nadenbousch also admits that at no time was an offer of optional UM/UIM coverage made to the Paughs during their application for the Umbrella Policy.

13. Westfield thereafter issued an Umbrella Insurance Policy to the Paughs having an effective date of December 7, 1994, with liability limits of $1 million but no stated UM/UIM

coverage limits.[2]

14.    With    annual    renewals    sent    to    policyholders    with
personal    automobile    insurance    policies    (not    its    umbrella
policies),  Westfield  included  Form  AD  8082  titled  "<u>IMPORTANT
NOTICE</u>."  This form contained offers of UM/UIM coverage on which
policyholders  could  elect  coverages  by  completing,  signing,  and
returning the form to Westfield.

15.    With  annual  renewals  of  its  umbrella  policies  sent  to
policyholders,    Westfield    included    the    UP    118    Form    titled
"PERSONAL    UMBRELLA    POLICY    UNINSURED    &    UNDERINSURED    MOTORIST
EXPLANATORY NOTICE."  This form differed in a number of respects
from  Form  AD  8082,  including,  but  not  limited  to,  not  including
the  "<u>IMPORTANT  NOTICE</u>"  and  not  containing  any  place  to  elect
coverage.

16.  Dailey could not recall ever having seen a UP 118 Form
until September 20, 2004, the day of his deposition.



17.  Despite Westfield's stated policy that the UP 118 Form
was to be provided to the customer at the time of the execution
of the AC 970 Form during the application process, Dailey never

---

[2]This policy was continuously renewed.

provided the UP 118 form to the Paughs.

18.  In receiving annual renewal materials from Westfield, Susan Paugh did not think that the UP 118 Forms applied to them, particularly in light of Dailey having told her that the Paughs could not get UM/UIM coverage.

19.  Westfield's Rule 30(b)(6) Corporate Representative, Thomas W. McFadden, admitted that "[y]our normal person isn't going to understand insurance anyway", and Dailey admitted that he does not even read renewals of his own insurance policies.

20.  Although the Paughs continued to look to Dailey to handle their insurance needs between the December 7, 1994 effective date of the Umbrella Policy and the May 29, 2002 accident, Dailey never informed them that they could obtain UM/UIM coverage from Westfield.

21.  Even at the time of the May 29, 2002, accident, Dailey believed that the Paughs did not have the option to purchase UM/UIM coverage under their Westfield umbrella policy.

22.  The Paughs relied upon Dailey's advice in insurance matters.


## II.  THE UNDISPUTED FACTS

After reviewing the pleadings, depositions, answers to interrogatories, and affidavits on file, the Court finds that

there are no genuine issues as to the following material facts:

1.    Beginning in the early 1990's and continuing at all times material to this case, Westfield's stated policy was to offer persons buying umbrella policies in West Virginia UM/UIM coverage up to the amount of the umbrella liability limits.[3]

2.    Westfield also at various times represented in filings with the West Virginia Insurance Commissioner that it was required to do so by West Virginia law.

3.    At all times material hereto, the defendant, Smith-Nadenbousch Insurance, Inc., was an insurance agency having an office in Martinsburg, West Virginia, and was authorized to take applications and bind insurance policies with Westfield.

---

[3]This policy was subject to Westfield's aggregate underwriting limit of 6 million dollars.

4. In November, 1993, Westfield through the Smith-Nadenbousch Agency in Martinsburg, West Virginia, sold the Paughs a personal auto policy having liability limits of $500,000.00. At this time, the Paughs elected UM/UIM coverage limits of $500,000.00.

5. Westfield maintains that as early as April, 1991, it notified its West Virginia agents that they should offer optional UM/UIM coverage and that West Virginia law required an effective offer and a knowing and intelligent waiver of such coverage.

6. Westfield required its West Virginia agents to discuss Form UP118, relating to umbrella UM/UIM coverage and applicable premiums for various coverage limits, with applicants and have applicants sign Form AC970 to elect or decline umbrella UM/UIM coverage.

7. In 1994, James S. Dailey, III, a Vice-President and Producer for Smith-Nadenbousch, contacted Susan Paugh and recommended that the Paughs purchase an Umbrella Policy from Westfield.

8. During the application process, Dailey incorrectly represented to Susan Paugh that in order to get a Westfield personal umbrella policy, the Paughs were required to reject umbrella UM/UIM coverage.

9.   In reliance on Dailey's representation, the Paughs signed Westfield Form AC970 purporting to reject umbrella UM/UIM coverage.

10.   At no time was an offer of UM/UIM coverage made to the Paughs during their application for the umbrella policy.

11.   Westfield thereafter issued an umbrella insurance policy to the Paughs having an effective date of December 7, 1994, with liability limits of 1 million dollars but no stated UM/UIM coverage.

12.   This umbrella policy was annually renewed thereafter, and was in effect at the time that Scott Paugh was seriously injured in an automobile accident with an uninsured or underinsured driver on May 29, 2002.

13.   Despite Westfield's stated policy that the UP118 Form was to be provided to the customer at the time of the execution of the AC970 Form during the application process, Dailey never provided the UP118 Form to the Paughs.

14.   In reviewing annual renewal materials from Westfield, Susan Paugh did not think that UP118 Forms, included in the renewal materials, applied to them, in light of Dailey having told her that the Paughs could not get UM/UIM coverage.

15.   Dailey himself could not recall ever having seen a

UP118 Form until September 20, 2004, the day of his deposition in this case.

16. The Paughs relied upon Dailey's advice in insurance matters.

17. Although the Paughs continued to look to and rely upon Dailey to handle their insurance needs between the December 7, 1994, effective date of the umbrella policy, and the May 29, 2002, accident, Dailey never informed them that they could obtain UM/UIM coverage from Westfield or that he had previously made incorrect representations in that regard.

18. Not only did the Paughs not know that they had the option to purchase UM/UIM coverage under their Westfield umbrella insurance policy, even up to the time of the May 29, 2002, accident, but Dailey, himself, a Vice-President and Producer for Smith-Nadenbousch, Inc., an insurance agency that was authorized to take applications and bind insurance policies with Westfield, likewise did not know that the Paughs had the option to purchase such coverage.

### III.  SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, as the United States Supreme Court noted in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), Rule 56(c) itself provides that "a party opposing a properly supported motion for summary judgment 'may not rest upon mere allegations or denials of [the] pleading, but ⋯ must set forth specific facts showing that there is a genuine issue for trial.' " "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. *See also Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law") (quoting *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394

(4th Cir.1950)).

In *Celotex,* the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. 2548. In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The material facts of this case are not in dispute for the purpose of ruling upon the cross-motions for summary judgment. The sole issue in this case is whether the Paughs are entitled to umbrella UM/UIM coverage of $1 million from Westfield applicable to their claims arising out of the May 29, 2002, motor vehicle accident.

### IV. DISCUSSION OF LAW

**A. WESTFIELD FAILED TO COMPLY WITH ITS STATUTORY OBLIGATION TO MAKE AN EFFECTIVE OFFER OF UM/UIM COVERAGE TO THE PAUGHS.**

**1. The Plain Language Of W.Va. Code § 33-6-31 Required Westfield To Make An Effective**

**Offer Of UM/UIM Coverage To The Paughs At The Time They Initially Applied For The Umbrella Policy.**

The key questions in resolving the coverage issue in this case are (1) whether Westfield was required under W. Va. Code § 33-6-31 to make an effective offer of UM/UIM coverage to the Paughs at the time Westfield issued the Umbrella Policy to them in 1994, and (2) if so, whether Westfield did, in fact, make such an offer. The Court concludes that the answers to these questions are that (1) Westfield was required to make an effective offer of UM/UIM coverage to the Paughs, but (2) failed to do so. Therefore, the Court concludes that UM/UIM coverage was included in the Umbrella Policy by operation of law. *See Hall v. Wiesner*, 844 F. Supp. 1120, 1122-23 (N.D. W. Va. 1994); *Bias v. Nationwide Mut. Ins. Co.*, 179 W. Va. 125, 127, 365 S.E.2d 789, 791 (1987). The legal authorities and reasoning supporting the Court's conclusion follows.

In looking at the first question, the primary goal in construing W. Va. Code § 33-6-31, as with any other statute, is to ascertain and give effect to the intent of the Legislature. *E.g., Poling v. Board of Educ. of County of Tucker*, 215 W. Va. 231, 599 S.E.2d 654, 657 (2004). The most basic canon of statutory construction is that any effort to ascertain the

14

intent of the Legislature is begun by examining "the literal and plain language of the statute." *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir. 1996). Where the language of the statute "'is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.'" *Barefield v. DPIC Cos.*, 215 W. Va. 544, 600 S.E.2d 256, 265 (2004) (quoting Syllabus Point 2, *State v. Elder,* 152 W. Va. 571, 165 S.E.2d 108 (1968)); *accord United States Dep't of Labor v. North Carolina Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004) (when the statute's language is plain, the court's sole function is to enforce the statute according to its terms); *Burrows v. Nationwide Mut. Ins. Co.*, 215 W. Va. 668, 600 S.E.2d 565, 572 (2004) ("[W]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."); *State v. Jarvis*, 199 W. Va. 635, 636, 487 S.E.2d 293, 294 (1997) (a statutory provision that is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect).

The language of W. Va. Code § 33-6-31 is clear and

unambiguous with regard to the coverage issue presented in this instance. Since 1982, West Virginia Code § 33-6-31 has required that every "policy or contract of bodily injury liability insurance, or property damage liability insurance, covering liability arising from the ownership, maintenance or use of any motor vehicle," issued or delivered in the State of West Virginia,

> shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance and property damage liability insurance purchased by the insured without setoff against the insured's policy or any other policy.

W. Va. Code § 33-6-31(a), (b). Because the Umbrella Policy is a policy or contract of insurance of the type specified in § 33-6-31, Westfield had a statutory obligation to make the Paughs an effective offer of UM/UIM coverage under § 33-6-31(b).

Westfield agreed in the Umbrella Policy issued to the Paughs that:

> We will pay the **net loss** in excess of the **retained limit** which the **insured** becomes legally obligated to pay as damages because of **bodily injury**, **personal injury** or **property damage** which occurs during the policy period and is caused by an **occurrence**.

An "occurrence" is defined in the Umbrella Policy as "an

accident . . . which results, during the policy period, in **bodily injury** or **property damage**."[4] "Bodily injury," in turn, is defined as "bodily harm, sickness or disease, including required care, loss of services or death resulting therefrom," while the term "property damage" means "damage to or loss of use of tangible property."

The Umbrella Policy contains a number of exclusions, several of which relate to the use of an "auto," which is defined to mean "a land motor vehicle, trailer or semi-trailer." In particular, the Umbrella Policy indicates that Westfield will not provide coverage for "bodily injury" or "property damage"

>    4. Arising out of the ownership, maintenance or use, loading or unloading of any **auto** or watercraft:
>
>       a. owned by an **insured** while rented or leased to any person or organization other than you.
>
>       b. owned by, or furnished or available for the regular use of any **relative**; however, this

---

[4]While the Umbrella Policy does not define the term "accident," the West Virginia Supreme Court has defined it as:

> an unusual, unexpected and unforeseen event. . . . An accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces the damage. . . . To be an accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual.

State Bancorp, Inc. v. United States Fidelity & Guar. Ins. Co., 199 W. Va. 99, 105, 483 S.E.2d 228, 234 (1997) (internal quotation omitted).

exclusion **(4.b.)** does not apply:

    (1)    to you while you are maintaining or occupying any **auto** or watercraft owned by; or furnished or available for the regular use of any **relative**; or

    (2)    to an **auto** covered by a **Primary Policy** shown in Item 3. of the Declarations.

    5.    Arising out of the activities of the owner or lessor, including their agents or employees, of an **auto** or watercraft loaned to, leased or hired for use by you or on your behalf.

The Umbrella Policy also excludes coverage for "property damage" to "**[a]utos** . . . rented, leased or in the care of an **insured**."

The doctrine of <u>expressio unius est exclusio alterius</u>--i.e., the express mention of one thing implies the exclusion of another--is applicable to the construction of any written document, including statutes and contracts. <u>See</u> <u>Ward v. Smith</u>, 140 W. Va. 791, 808, 86 S.E.2d 539, 549 (1955) and <u>Bischoff v. Francesa</u>, 133 W. Va. 474, 488, 56 S.E.2d 865, 873 (1949). Under this doctrine, the express exclusion in the Umbrella Policy of coverage for certain types of bodily injury or property damage "arising out of the ownership, maintenance or use . . . of any auto" clearly indicates the intent to provide coverage for all other types of bodily injury or property damage arising out of the use of an automobile that were not specifically excluded in

the Umbrella Policy (such as injuries caused by a motor vehicle accident involving an automobile owned and driven by the named insured).  Cf. Johnson v. Continental Cas. Co., 157 W. Va. 572, 578, 201 S.E.2d 292, 296 (1973) (the exclusion of one subject or thing in a statute is the inclusion of all others). Accordingly, the Umbrella Policy issued to the Paughs clearly falls within the plain language of W. Va. Code § 33-6-31, inasmuch as it is a "policy or contract of bodily injury liability insurance, or of property damage liability insurance, covering liability arising from the ownership, maintenance or use of any motor vehicle."  W. Va. Code § 33-6-31(a).

Because the Umbrella Policy is a policy or contract of bodily injury or property damage insurance covering liability arising from the ownership, maintenance, or use of a motor vehicle, the third proviso of W. Va. Code § 33-6-31(b), quoted above, required Westfield to offer the Paughs an option to purchase both UM/UIM coverage up to the dollar limits of the liability insurance they purchased from Westfield.  See Hall v. Wiesner, 844 F. Supp. 1120, 1122 (N.D. W. Va. 1994); Bias v. Nationwide, 179 W. Va. 125, 126, 365 S.E.2d 789, 790 (1987).  As the West Virginia Supreme Court explained in Bias, the language of § 33-6-31(b)

must be afforded a mandatory connotation. Syl. Pt. 1, _Nelson v. West Virginia Public Employees Insurance Board_, 171 W. Va. 445, 300 S.E.2d 86 (1982). Where an offer of optional coverage is required by statute, the insurer has the burden of proving that an effective offer was made, _Holman v. All Nation Insurance Co._, 288 N.W.2d 244 (Minn. 1980), and that any rejection of said offer by the insured was knowing and informed, _Kimbrell v. Great American Ins. Co._, 420 So. 2d 1086 (Fla. 1982); _Lane v. Waste Management, Inc._, 432 So. 2d 70 (Fla. App. Dist. 1983). The insurer's offer must be made in a commercially reasonable manner, so as to provide the insured with adequate information to make an intelligent decision. _State Farm Mutual Automobile Insurance Co. v. Wannamaker_, 291 S.C. 518, 354 S.E.2d 555 (1987). The offer must state, in definite, intelligible, and specific terms, the nature of the coverage offered, the coverage limits, and the costs involved.

Decisions in other states are not relevant to consideration of the controlling West Virginia statute, which unequivocally states that an offer of optional UM/UIM coverage shall be provided under any "policy or contract of bodily injury liability insurance, or of property damage liability insurance, covering liability arising from the ownership, maintenance or use of any motor vehicle." W. Va. Code § 33-6-31(a), (b). As demonstrated above, the Umbrella Policy is unquestionably a policy or contract of bodily injury or property damage liability insurance that covers liability arising from the ownership, maintenance, or use of a motor vehicle in a wide variety of circumstances, including, without limitation, an automobile

20

accident.  As such, Westfield was required, under the plain

language of § 33-6-31, to make an effective offer of optional

UM/UIM coverage to the Paughs under the Umbrella Policy.  <u>See</u>

<u>United States Dep't of Labor v. North Carolina Growers Ass'n</u>,

377 F.3d 345, 350 (4th Cir. 2004) (when the statute's language

is plain, the court's sole function is to enforce the statute

according to its terms); <u>Bluestone Paving, Inc., v. Tax Comm'r</u>

<u>of State of West Virginia</u>, 214 W. Va. 684, 689, 591 S.E.2d 242,

247 (2003) (where the language of a statute is clear and without

ambiguity, the plain meaning is to be accepted without resorting

to the rules of interpretation); <u>State v. Jarvis</u>, 199 W. Va.

635, 636, 487 S.E.2d 293, 294 (1997) (a statutory provision that

is clear and unambiguous and plainly expresses the legislative

intent will not be interpreted by the courts but will be given

full force and effect).

    The question of whether optional UM/UIM coverage must be

offered under an umbrella policy pursuant to the West Virginia

statute was squarely addressed by the United States District

Court for the Southern District of West Virginia, Judge

Copenhaver presiding, in <u>Walker-Harrah v. Liberty Mutual</u>

<u>Insurance Company</u>, Civil Action No. 2:97-1265.  In that case,

the plaintiff had purchased from Liberty Mutual an umbrella

liability coverage policy with a limit of $1 million per

occurrence. As in this case, it was undisputed that the insurance agent did not offer the insureds UM/UIM coverage in connection with that umbrella policy. As a result of an automobile accident, the plaintiff made a claim for benefits under the umbrella policy after exhausting the limits of her primary automobile policy. Liberty Mutual denied coverage in part because, it argued, West Virginia Code § 33-6-31(b) does not impose an obligation on an insurer to offer optional UM/UIM coverage on umbrella polices.

In its Memorandum Order, entered on September 29, 2000, the Court rejected Liberty Mutual's argument, concluding that its reliance on decisions from other jurisdictions was misplaced in light of the plain language of the West Virginia statute:

> The key to deciding this issue lies in the language of the West Virginia statute. As noted previously, § 33-6-31(b) provides that no policy or contract of bodily injury liability insurance covering liability arising from the ownership, maintenance or use of any motor vehicle shall be issued or delivered unless it provides an option to the insured to purchase underinsured motorist coverage in an amount up to the limits of bodily injury liability insurance purchased by the insured in a liability policy. W. Va. Code § 33-6-31(b) (Supp. 2000). The statute affords no distinction between automobile liability insurance policies and umbrella policies. Had the Legislature intended to exclude umbrella policies from the statutory application, it could have done so. Thus, the court is of the view that "any such policy or contract" of bodily injury liability insurance covering liability arising from the ownership,

maintenance, or use of any motor vehicle means any kind of policy, including an umbrella policy, that covers liability for bodily injuries arising out of the ownership, maintenance, or use of a motor vehicle. The West Virginia Supreme Court has traditionally held that "[w]here the provisions of an insurance policy are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Ward v. Baker, 425 S.E.2d 245, 251 (W. Va. 1992) (quoting Keffer v. Prudential Ins. Co., 172 S.E.2d 714, Syl. (W. Va. 1970)). Thus, under the provisions of the West Virginia statute, there is no room for statutory construction. Notwithstanding defendant's reliance on cases which have held otherwise, the West Virginia underinsured motorist statute differs from those of other jurisdictions in important particulars and therefore cannot be governed by other state statutes which are distinguishable.

(Id. at 26-28; see also id. at 18 (noting that umbrella policy at issue was not excluded from W. Va. Code § 33-6-31(a) because it provided coverage for injuries arising out of the ownership, maintenance, or use of a motor vehicle).) Since it was undisputed that Liberty Mutual had failed to make an effective offer of optional UIM coverage under the umbrella policy, the court granted the plaintiff's motion for summary judgment to the extent that it found, following Bias, that the umbrella policy provided UIM coverage in an amount equal to the level of liability coverage purchased by the plaintiff, or $1 million. (Id. at 28-29, 33.)

23

Judge Copenhaver's reading of the West Virginia statute was subsequently confirmed by the West Virginia Legislature's clarification of § 33-6-31 through the enactment of § 33-6-31f in 2001. Section 33-6-31f provides, in pertinent part:

> (a) Notwithstanding any other provisions of this article, insurers issuing or providing liability policies that are of an excess or umbrella type and which are written to cover automobile liability shall offer uninsured and underinsured motor vehicle coverage on such policies in an amount not less than the amount of liability insurance purchased by the named insured: Provided, That the named insured may decline any or all of the coverage offered under the excess or umbrella type policy.

> (b) Offers of optional uninsured and underinsured motor vehicle coverage required by subsection (a) of this section shall be made to the named insured on a form prepared and made available by the insurance commissioner on or before the effective date of this section. The form shall allow any named insured to decline any or all of the coverage offered.

Section 33-6-31f is consistent with the plain language of § 33-6-31, which, as Judge Copenhaver correctly concluded in <u>Walker-Harrah</u>, already required insurers issuing umbrella polices that were written to cover automobile liability to offer optional UM/UIM coverage. Accordingly, § 33-6-31f merely clarified the legislative intent of § 33-6-31, and the two statutes should be read <u>in pari materia</u> with one another, just as is the case with § 33-6-31 and the later enacted § 33-6-31d, which, like § 33-6-

31f, specifies the manner in which an insurer must make an offer of optional UM/UIM coverage in order to satisfy the requirements of § 33-6-31. See Parham, 200 W. Va. at 619-20, 490 S.E.2d at 706-07; Cox, 195 W. Va. at 615, 466 S.E.2d at 466; see also State Auto. Mut. Ins. Co. v. Youler, 183 W. Va. 556, 569-70, 396 S.E.2d 737, 750-51 (1990) (rejecting argument that a 1988 amendment to § 33-6-31(b) was a change in the law rather than a clarification of existing law, in light of the clear language in the statute prior to 1988).

In summary, the Court concludes that the Umbrella Policy is unquestionably a "policy or contract of bodily injury liability insurance, or property damage liability insurance, covering liability arising from the ownership, maintenance or use of any motor vehicle," W. Va. Code § 33-6-31(a), and, thus, Westfield was required to make the Paughs an effective, commercially reasonable offer of UM/UIM coverage under § 33-6-31(b). This was the conclusion correctly reached by Judge Copenhaver in *Walker-Harrah v. Liberty Mut. Ins. Co.*, Civil Action No. 2:97-1265 (S.D. W. Va. Sept. 29, 2000), in deciding that UM/UIM coverage was required to be offered under an umbrella policy pursuant to W. Va. Code § 33-6-31.

The Court will now address Westfield's additional arguments. In arguing that it was not required to offer optional UM/UIM coverage under its umbrella policies prior to the enactment of W. Va. Code § 33-6-31f in 2001, Westfield ignores the rule that the plain language of a clear and unambiguous statute is to be accepted without resorting to the rules of interpretation, citing *Burrows* in support of its assertion that the court should "reject *Walker-Harrah*'s conclusion because W. Va. Code § 33-6-31 clearly expresses the Legislature's intent." However, Westfield does not examine the plain language of § 33-6-31. Instead, Westfield bases its entire argument that § 33-6-31 does not apply to umbrella UM/UIM coverage on various intrinsic and extrinsic aids to construction, including the title of the act, another statute located in a different chapter of the West Virginia Code, and an Ohio case interpreting an Ohio statute.

In order to avoid the import of the plain language of the controlling statute, Westfield claims that the court's holding in *Walker-Harrah* that § 33-6-31 applies to umbrella policies violated the "single subject" rule embodied in W. Va. Const.

art. VI, § 30.[5]   In this regard, Westfield contends that the
phrase "motor vehicle liability policies" in the title of the
act should be given greater effect than the plain language of
the statute itself because the statute would otherwise be
unconstitutional under the "single subject" rule embodied in W.
Va. Const. art. VI, § 30.   However, Westfield fails to address
any of the West Virginia cases describing the test for measuring
the constitutionality of a statute under W. Va. Const. art. VI,
§ 30.   Rather, Westfield merely implies that because the title
of the act expressly mentions a "motor vehicle liability policy"
it must, therefore, exclude any other type of insurance policy
from its reach.   However, the rule of *expressio unius est*
*esclusio alterius* (the express mention of one thing implies the
exclusion of another) does not apply as a test of compliance
with the single-subject rule.   *Loving County v. Higginbotham*,
115 S.W.2d 1110, 1121 (Tex. Civ. App. 1938); *see also Mayo v.*
*Polk Co.*, 169 So. 41, 43 (Fla.) (the rule that the expression of
one thing is the exclusion of another, while generally a sound

---

[5]Article VI, § 30 of the West Virginia Constitution provides, in
relevant part, that

    No act hereafter passed [] shall embrace more than one
    object, and that shall be expressed in the title.   But if any
    object shall be embraced in an act which is not so expressed, the
    act shall be void only as to so much thereof, as shall not  be so
    expressed[.]

rule of statutory construction, has no application to the title of an act), *appeal dismissed*, 299 U.S. 507 (1936); 1A Singer, *supra*, § 18:4 (same).

To the contrary, it is well established that a court should construe the language and title of an act in "'the most comprehensive sense favorable to its validity'" when determining whether the act violates W. Va. Const. art. VI, § 30. *McCoy v. VanKirk*, 201 W. Va. 718, 730, 500 S.E.2d 534, 546 (1997) (quoting Syllabus Point 2, *State ex rel. Graney v. Sims,* 144 W. Va. 72, 105 S.E.2d 886 (1958)). This is consistent with the more general rule that the unconstitutionality of a statute must be shown "beyond a reasonable doubt." *McCoy*, 201 W.Va. at 728, 500 S.E.2d at 544 ("'Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question.'") (quoting Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965)).

In attempting to formulate a standard which would enable it "to immediately tell whether an act violates the one-subject rule," the West Virginia Supreme Court of Appeals has approved of the following statement found in 1A Singer, *supra*, § 17.3:

"'If there is any reasonable basis for grouping the various matters together [in one statute], and if the public will not be deceived, the act will be sustained.'" *Kincaid v. Mangum*, 189 W. Va. 404, 411, 432 S.E.2d 74, 81 (1993). The court further explained that

> [w]here the Legislature undertakes to legislate upon a particular subject for the accomplishment of a certain object, it is competent to embrace within one act all regulations *germane* to the subject of legislation which may be appropriate to accomplish the object sought. It is only the joining in one act of two separate subjects of legislation which is inhibited, and not the joining of many separate provisions touching one subject, and having for their object the accomplishment of one purpose.

189 W. Va. at 410, 432 S.E.2d at 80; *see also McCoy*, 201 W. Va. at 730, 500 S.E.2d at 546 (the title of an act is sufficient if it states the general theme or purpose of the statute and the substance is germane to the object expressed in the title).

Adopting an exceedingly narrow reading of the title of the act, Westfield argues that the legislature enacted W. Va. Code § 33-6-31 with a single focus, "motor vehicle liability policies." However, the purpose of § 33-6-31, which is sufficiently expressed in the title of the act, is to insure that innocent West Virginia citizens who are injured in motor vehicle accidents are protected against the loss and hardships caused by negligent, financially irresponsible drivers who are uninsured

or underinsured.  *Perkins v. Doe,* 177 W. Va. 84, 87, 350 S.E.2d 711, 714 (1986); *see also Hartwell v. Marquez,* 201 W. Va. 433, 441, 498 S.E.2d 1, 9 (1997) ("This state's interest in the just compensation of its citizens for injuries received in motor vehicle accidents is evidenced by the requirement that all insurance policies issued or delivered in this state provide uninsured motorist coverage and an option for underinsured motorist coverage.").  The accomplishment of that purpose is served just as well by requiring that umbrella policies that cover liability arising from the use of a motor vehicle offer optional UM/UIM coverage as it is by requiring that automobile policies offer such coverage.  Since the inclusion of umbrella policies in § 33-6-31 is germane to the single subject of the act, there is no constitutional problem in applying the statute to umbrella policies.

Finally, Westfield argues that § 33-6-31 cannot have applied to umbrella policies prior to the enactment of § 33-6-31f in 2001 because § 33-6-31f would have been "superfluous" if § 33-6-31 does apply to umbrella policies.  Westfield's argument ignores the cases in which the West Virginia Supreme Court has consistently held that various acts amending or adding to § 33-6-31 should be read *in pari materia* with § 33-6-31 because they merely clarify the legislative intent behind the statute rather

than change existing law. *See, e.g.*, *Parham v. Horace Mann Ins. Co.*, 200 W. Va. 609, 619-20, 490 S.E.2d 696, 706-07 (1997); *Cox v. Amick*, 195 W. Va. 608, 615, 466 S.E.2d 459, 466 (1995); *State Auto. Mut. Ins. Co. v. Youler*, 183 W. Va. 556, 569-70, 396 S.E.2d 737, 750-51 (1990).

For example, prior to 1988, W. Va. Code § 33-6-31(b) provided, in relevant part, that an insurance policy covering liability arising from the ownership, maintenance, or use of any motor vehicle

> shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance and property damage liability insurance purchased by the insured.

*See Youler*, 183 W. Va. at 564, 396 S.E.2d at 745. Section 33-6-31(b) was amended in 1988, after the operative facts in *Youler*,

> to very explicitly preclude "setoffs" of liability insurance coverage against underinsured motorist coverage limits. The language added, in two places, is as follows. First, at the end of the statutory language, "all sums . . . as damages . . . up to an amount not less than limits of . . . liability insurance purchased by the insured," these words were added: "without setoff against the insured's policy or any other policy." Second, at the end of the definition of "underinsured motor vehicle" in this same statute, these words were added: "No sums payable as a result of underinsured motorists' coverage shall be reduced by payments made under the insured's policy or any other policy."

183 W. Va. at 569, 396 S.E.2d at 750. The insurer argued in *Youler* that the 1988 amendments to § 33-6-31(b) indicated "a change in the law, so that prior thereto, and therefore in this case, the statute allowed a setoff of the tortfeasor's liability insurance coverage against the injured person's underinsured motorist coverage limits." *Id.* In effect, the insurer argued, just like Westfield in this case, that the addition of the very explicit "setoff" language in 1988 would have been superfluous if the plain language of the statute had already precluded a setoff prior to 1988.

The West Virginia Supreme Court of Appeals disagreed, however.

> In light of the clear "all sums . . . as damages"
> language in the statute prior to 1988, this Court
> believes that the 1988 additions in this regard to the
> statute constitute only a clarification of the
> legislature's original intent to preclude the type of
> setoff proposed by State Auto here. *See Mid-Century
> Insurance Co. v. Daniel,* 101 Nev. 433, 436-37, 705
> P.2d 156, 158-59 (1985) (plain language of original
> enactment, applicable at time of case, was to embrace
> excess-type underinsured motorist coverage, requiring
> setoff to be against damages; more explicit language
> in subsequent amendment to statute was merely a
> clarification of legislature's original intent, not an
> indicator of a change in the law).

183 W. Va. at 569-70, 396 S.E.2d at 750-51.

This case is no different. Since the 1988 amendment, the plain language of § 33-6-31 has required that every

> policy or contract of bodily injury liability
> insurance, or property damage liability insurance,
> covering liability arising from the ownership,
> maintenance, or use of any motor vehicle . . . shall
> provide an option to the insured with appropriately
> adjusted premiums to pay the insured all sums which he
> shall legally be entitled to recover as damages from
> the owner or operator of an uninsured or underinsured
> motor vehicle up to an amount not less than limits of
> bodily injury liability insurance and property damage
> liability insurance purchased by the insured without
> setoff against the insured's policy or any other
> policy.

W. Va. Code § 33-6-31(a), (b). Thus, even before the addition of § 33-6-31f, Westfield was required by § 33-6-31 to offer optional UM/UIM coverage in any of its umbrella policies covering bodily injury or property damage liability arising from the ownership, maintenance, or use of any motor vehicle. Because § 33-6-31f merely clarified the legislative intent of § 33-6-31 in this regard, the two statutes should be read *in pari materia* with one another. *See Parham*, 200 W. Va. at 619-20, 490 S.E.2d at 706-07; *Cox*, 195 W. Va. at 615, 466 S.E.2d at 466.

It is elementary that a statutory amendment "'need not *ipso facto* constitute a change in meaning or effect. Statutes may be passed purely to make what was intended all along even more unmistakably clear.'" *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) (quoting *United States v. Montgomery County*, 761 F.2d 998, 1003 (4th Cir. 1985)). Thus, where the legislative intent of the original enactment was adequately expressed in the plain

33

language of the statute, an amendment of or addition to the original statute should be seen as "a mere clarification of the existing statute," rather than a change in the law. *Williams v. West Virginia Dep't of Motor Vehicle*, 187 W. Va. 406, 408, 419 S.E.2d 474, 476 (1992) (proviso added to W. Va. Code § 17D-2A-7(a) in 1990 was a mere clarification of the existing statute); *accord State Auto. Mut. Ins. Co. v. Youler*, 183 W. Va. 556, 569-70, 396 S.E.2d 737, 750-51 (1990) (when the plain language of the original enactment is consistent with the language of the new statute, the "amendment" is merely a clarification of the legislature's original intent). In cases where the new statute merely clarifies the intent of the original enactment, the two statutes are read *in pari materia* with one another "'to assure recognition and implementation of the legislative intent.'" *Cox v. Amick*, 195 W. Va. 608, 615, 466 S.E.2d 459, 466 (1995) (quoting Syllabus Point 1, *State ex rel. Lambert v. County Comm'n of Boone County*, 192 W. Va. 448, 452 S.E.2d 906 (1994)); *accord Parham v. Horace Mann Ins. Co.*, 200 W. Va. 609, 619-20, 490 S.E.2d 696, 706-07 (1997); *see also Williams*, 187 W. Va. at 408-09, 419 S.E.2d at 476-77 ("A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to

form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.") (internal quotations omitted).

Asserting that W. Va. Code § 33-6-31f is somehow unique, Westfield attempts to distinguish all of these cases in which the West Virginia Supreme Court has consistently held that new statutes dealing with UM/UIM coverage enacted after the original § 33-6-31 should be read *in pari materia* with one another. Westfield's argument that § 33-6-31f would have been "superfluous" if § 33-6-31(b) was intended to apply to umbrella policies is particularly problematic in light of the *Youler* case. Moreover, the court held subsequent to *Youler* that the 1988 amendment to § 33-6-31(b) could be applied retroactively since "[t]his preclusion of offsets was the public policy of this state prior to the 1988 amendments which explicitly added such language to W. Va. Code § 33-6-31(b)." *Brown v. Crum*, 184 W. Va. 352, 355, 400 S.E.2d 596, 599 (1990).

Similarly, the public policy behind § 33-6-31 of insuring that innocent West Virginia citizens who are injured in automobile accidents are protected against the loss and hardships caused by negligent, financially irresponsible drivers who are uninsured or underinsured has always been served by requiring that umbrella policies that cover liability arising from the use of a motor vehicle offer optional UM/UIM coverage. As such, adding § 33-6-31f to the group of statutes giving effect to this public policy in order to clarify the legislative intent with regard to umbrella policies was no more "superfluous" than amending § 33-6-31 in 1988 in order to include very explicit "setoff" language even though the preclusion of offsets was already the public policy of West Virginia prior to 1988.

In sum, even before the addition of § 33-6-31f to the body of statutes dealing with UM/UIM coverage, Westfield was required by § 33-6-31 to offer optional UM/UIM coverage in any of its umbrella policies covering bodily injury or property damage liability arising from the ownership, maintenance, or use of any motor vehicle. Because Westfield failed to make an effective offer of UM/UIM coverage to the Paughs at the time they initially applied for the Umbrella Policy, in the manner

required by statute, such coverage was included in the Umbrella Policy by operation of law. *See Hall v. Wiesner*, 844 F. Supp. 1120, 1122-23 (N.D. W. Va. 1994); *Bias v. Nationwide Mut. Ins. Co.*, 179 W. Va. 125, 127, 365 S.E.2d 789, 791 (1987).

### 2. Westfield Failed To Make An Effective Offer Of UM/UIM Coverage To The Paughs.

Westfield further argues that, even if it was required to offer UM/UIM coverage to the Paughs, it repeatedly did so through its mailing of Form UP 118 to the Paughs along with their annual renewal forms. Westfield's argument fails for three reasons.

First, W. Va. Code § 33-6-31d, which was enacted in 1993 in order to clarify the intent of § 33-6-31 by specifying the manner in which an insurer shall make an offer of optional UM/UIM coverage to the insured, *see Parham*, 200 W. Va. at 619-20, 490 S.E.2d at 706-07, required that Westfield offer optional UM/UIM coverage to the Paughs at the time they initially applied for liability coverage under the Umbrella Policy, using the form specified by the West Virginia Insurance Commissioner in Informational Letter No. 88. *See* W. Va. Code § 33-6-31d(a). Here, it is undisputed that Dailey never provided Form UP 118 to the Paughs at the time they initially applied for the Umbrella Policy. As such, it is irrelevant whether Westfield sent the

37

form to the Paughs in later years.

Second, while Form UP 118 that was later sent to the Paughs along with the annual renewals of the Umbrella Policy contained some of the information required by § 33-6-31d and Informational Letter No. 88, Form UP 118 was not in the form prescribed by the West Virginia Insurance Commissioner and did not include the required "Important Notice." (Informational Letter No. 88 required that the prescribed "Important Notice" be provided to the insured whenever optional coverage had to be offered to an applicant). As such, even if Form UP 118 had been provided to the Paughs at the time they initially applied for the Umbrella Policy, there still would not have been an effective offer of optional UM/UIM coverage, and their execution of Form AC 970, in which the Paughs declined UM/UIM coverage because Dailey said they must, would not have constituted a knowing and intelligent rejection of such coverage. *See Ammons v. Transportation Ins. Co.*, 219 F. Supp. 2d 885, 891 (S.D. Ohio 2002) (applying West Virginia law) (rejecting insurer's argument that insured gave a knowing and informed waiver of UM coverage "despite the fact that [the insurer] failed to provide [the insured] with the UM coverage form prescribed by Informational Letter No. 88").

Third, even if Westfield had used the prescribed form when the Paughs initially applied for the Umbrella Policy, there still would not have been an effective offer of optional UM/UIM coverage, as required by §§ 33-6-31 and 33-6-31d. Westfield admits that its agent, Dailey, upon whom the Paughs relied without question, specifically informed the Paughs that Westfield was not offering umbrella UM/UIM coverage in the State of West Virginia at that time and that the Paughs were required to reject excess UM/UIM coverage during the application process for the Umbrella Policy or the Policy would not have been approved. If an applicant is made aware that he or she cannot obtain an umbrella policy unless he or she elects to reject a purported offer of optional UM/UIM coverage, then there can be no effective "offer" of such coverage within the ordinary meaning of that word, since the offeree has no power to accept the offer and to so conclude a bargain with the offeror. *See Charbonnages de France v. Smith*, 597 F.2d 406, 417 (4th Cir. 1979) (applying West Virginia law) ("An offer must be certain in its essential terms to create a power of acceptance."); Restatement (Second) of Contracts § 24 (1981) (an "offer" is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his

assent to that bargain is invited and will conclude it"). Therefore, it is undisputed that Westfield failed to make an effective, commercially reasonable offer of optional UM/UIM coverage at the time the Paughs initially applied for the Umbrella Policy, as required by West Virginia law.

> 3. **Because Westfield did not make an effective offer of UM/UIM coverage to the Paughs, such coverage was included in the umbrella policy by operation of law, regardless of whose fault it was that no such offer was made.**

Despite having conceded that its agent negligently failed to offer UM/UIM coverage to the Paughs at the time they initially applied for the Umbrella Policy, Westfield nevertheless contends that it may not be held liable for umbrella UM/UIM coverage based on Dailey's misrepresentations. There are two flaws in Westfield's position.

First, it cannot be any clearer under West Virginia law that

> When an insurer is required by statute to offer optional coverage, it is included in the policy by operation of law when the insurer fails to prove an effective offer and a knowing and intelligent rejection by the insured. *Bias*, 365 S.E.2d at 791. When it is found that an insurer failed to prove that an effective offer was made and that a waiver was knowing and informed, the amount of coverage included in the policy by operation of law is the amount the insurer is required to offer under the statute (the limits of bodily injury liability insurance in the policy). *Riffle v. State Farm Mut. Auto. Ins. Co.*, 186 W.Va. 54, 410 S.E.2d 413, 414 (1991).

*Hall*, 844 F. Supp. at 1123; *accord Westfield Ins. Co. v. Bell*, 203 W. Va. 305, 308, 507 S.E.2d 406, 409 (1998) ("If the insurance carrier fails to introduce sufficient proof of a commercially reasonable offer, then underinsured motorist coverage in an amount equal to the limits of liability coverage is automatically included in the insurance policy."); *Kalwar v. Liberty Mut. Ins. Co.*, 203 W. Va. 2, 6, 506 S.E.2d 39, 43 (1998) (same). If the insurer fails to prove that it made the required offer of UM/UIM coverage, for whatever reason, then the coverage is "automatically included" in the insurance policy by operation of law. This rule would be meaningless if the insurer could avoid it simply by pointing to the actions taken by its agent, who will, in the end, always be the one responsible for communicating the insurer's offer to the insured at the time initial application is made for an insurance policy.

Second, in attempting to distance itself from the undisputed failure of its agent to make an effective offer of optional UM/UIM coverage to the Paughs, Westfield relies on the doctrine of *respondeat superior*, arguing that it cannot be held liable for its agent's tortious acts because "Dailey's statements were clearly contrary to, and beyond the scope of, any agency relationship with Westfield." However, the inclusion of UM/UIM coverage in the Umbrella Policy by operation of law is

a matter of insurance law, not tort law.

Moreover, common-law rules of *respondeat superior* cannot be controlling in the face of W. Va. Code § 33-12-22, which specifically provides that "[a]ny person who shall solicit within this state an application for insurance shall, in any controversy between the insured . . . and the insurer issuing any policy upon such application, be regarded as the agent of the issuer and not the agent of the insured." *See also Riffe v. Home Finders Assocs., Inc.*, 205 W. Va. 216, 223, 517 S.E.2d 313, 320 (1999) ("'It is obvious from the clear and unambiguous language of the statute that the solicitor of the application for insurance should be regarded for all purposes as the agent of the insurer in any controversy between it and the insured or his beneficiary.'") (quoting *Smithson v. United States Fidelity & Guar. Co.*, 186 W. Va. 195, 204, 411 S.E.2d 850, 859 (1991)). Thus, in *Riffe*, the West Virginia Supreme Court rejected the insurer's argument that the agent who sold its policy to the insureds was not acting as the insurer's agent when he made certain statements and representations concerning the contract to the insureds. 205 W. Va. at 223, 517 S.E.2d at 320. Section 33-12-22 is consistent with the general rule that "[i]f either party must suffer from the insurance agent's mistake, it must be the insurance company." *Hartford Accident. & Indem. Co. v.*

*Armstrong*, 127 N.E.2d 347, 352 (Ind. Ct. App. 1955); *see also*
*St. Louis Fire & Marine Ins. Co. v. Witney*, 96 F. Supp. 555, 565
(M.D. Pa. 1951) ("The insured ought not to be prejudiced by the
mistake of the insurance agent."); *Aetna Life & Cas. Co. v.*
*Little*, 384 So. 2d 213, 215 (Fla. Dist. Ct. App. 1980) (since
general line agent informed insured that he was covered and even
wrote a letter to that effect, the insurer was bound, even
though the agent violated the insurer's "unfailing practice" by
issuing coverage without approval; also finding that the insurer
could recover on its third-party claim against the agent).

While Westfield may be able to hold Dailey and/or Smith-
Nadenbousch liable for failing to make an effective offer of
optional UM/UIM coverage to the Paughs at the time they applied
for the Umbrella Policy, the division of responsibility between
Westfield and its agents is of no consequence to the issue of
whether or not such coverage was included in the Umbrella
Policy.  Since no effective offer of UM/UIM coverage was made to
the Paughs, such coverage was included in the Umbrella Policy by
operation of law, regardless of whose fault it was that no such
offer was made.

      **B.    WESTFIELD IS ESTOPPED FROM DENYING UMBRELLA**
              **UM/UIM COVERAGE TO THE PAUGHS.**

Even if UM/UIM coverage had not been included in the Umbrella Policy by operation of law, Westfield would nevertheless be estopped from denying such coverage to the Paughs in light of the misrepresentations that Westfield admits that its agent made to the Paughs at the time they initially applied for the Umbrella Policy. It is undisputed that it was Westfield's policy to offer UM/UIM coverage to applicants for umbrella insurance, that the Paughs should have been offered the coverage, that Westfield's agent, Dailey, misrepresented to the Paughs that they were required to reject the coverage, and that in reliance thereon the Paughs rejected the coverage.

The doctrine of estoppel "is properly invoked to prevent a litigant from asserting a claim or a defense against a party who has detrimentally changed its position in reliance upon the litigant's misrepresentation or failure to disclose a material fact." *Marlin v. Wetzel County Bd. of Educ.*, 212 W. Va. 215, 225, 569 S.E.2d 462, 472 (2002). Although the doctrine generally does not apply to extend insurance coverage beyond the terms of an insurance policy, there are numerous exceptions to this rule, including cases "where an insured has been prejudiced because... an insurer's, or its agent's, misrepresentation made at the policy's inception resulted in the insured being

44

prohibited from procuring the coverage s/he desired." 212 W. Va. at 225, 569 S.E.2d at 472 (quoting Syllabus Point 7, *Potesta v. United States Fidelity & Guar. Co.*, 202 W. Va. 308, 504 S.E.2d 135 (1998)).

In this case, Westfield concedes that Dailey, its agent in soliciting the application for the Umbrella Policy from the Paughs, did not provide Form UP118, the umbrella UM/UIM coverage explanation, to the Paughs when they initially applied for the Umbrella Policy. (Document #125 at 10 and 14). Even if Dailey had provided the Form UP118 to the Paughs at that time, he still specifically "told the Paughs that they must reject umbrella UM/UIM coverage" or they would not be issued the Umbrella Policy by Westfield. (Document #125 at 10). Finally, Westfield also admits that the Paughs "relied and acted on" Dailey's advice in rejecting optional UM/UIM coverage under the Umbrella Policy. (Document # 119 at 5; *see also* Document #118 at 3 ("Mrs. Paugh trusted Mr. Dailey; she followed without question his recommendation that the Paughs go ahead with Westfield's Umbrella Policy, even without UM/UIM coverage."), Document #118 at 8 ("Mr. Dailey agreed that Mrs. Paugh relied on him for proper advice on whether she could buy umbrella UM/UIM coverage.").)

In short, at the same time that it argues that the Paughs

45

meet none of the requirements for coverage by estoppel, Westfield actually admits all of the material, undisputed facts giving rise to the estoppel. Nevertheless, Westfield contends that (1) the Paughs did not rely on its misrepresentations to their detriment, and (2) it cannot be held liable for the misrepresentations of its agent, Dailey.

In making its first argument, Westfield focuses on the fact that Mrs. Paugh "reviewed Form UP118 sent with the Umbrella Policy renewal packages", the implication apparently being that Mrs. Paugh could have, at some point before the May 29, 2002, accident in which Mr. Paugh was injured, asked Dailey about the information contained in the Form UP118 and requested optional UM/UIM coverage, despite Dailey's earlier misrepresentation that no such coverage was available to the Paughs under the Umbrella Policy.[6] However, the focus of an inquiry into coverage by estoppel is not on anything that may have occurred at the time of renewal, but on the misrepresentations that were made by the insurer or its agent "at the policy's inception." *Marlin*, 212

---

[6]There is some suggestion in Westfield's argument that Mrs. Paugh should have known enough to do so because she is "a practicing attorney." (*Id.*) However, the West Virginia Supreme Court has squarely rejected the proposition that "a law school graduate" should be held to a higher standard than any other insured when dealing with an insurance company. *Kalwar v. Liberty Mut. Ins. Co.*, 203 W. Va. 2, 6, 506 S.E.2d 39, 43 (1998) (finding that no commercially reasonable offer of optional UM/UIM coverage was made to the plaintiff attorney).

W. Va. at 225, 569 S.E.2d at 472. This is entirely consistent with W. Va. Code § 33-6-31d(a), which requires that optional UM/UIM coverage be offered to the insured, in the form prescribed by the West Virginia Insurance Commissioner, "at the time of initial application for liability coverage." Here, Westfield admits that the Paughs did not receive Form UP118, which was never in the form prescribed by the Insurance Commissioner at the time they applied for the Umbrella Policy. Thus, whether or not Westfield provided Form UP118 to the Paughs in later years is not relevant to the question of whether Westfield is estopped from denying coverage based on the misrepresentations made by its agent at the time the Paughs initially applied for the Umbrella Policy. Moreover, it is undisputed that in light of Dailey's misrepresentation that the Paughs could not get UM/UIM coverage under the umbrella policy that Mrs. Paugh did not think the UP118 Form applied to them and that up to the time of the May 29, 2002, accident, Dailey, himself, continued to believe that the Paughs could not purchase this coverage.

Westfield's second argument is that no facts support its

vicarious liability for the admitted misrepresentations of its
agent, Dailey. Contrary to Westfield's position in this regard,
the Paughs have not asserted Westfield's "vicarious liability"
for Dailey's acts. (*Id.* at 15.) Vicarious liability, or
*respondeat superior*, is a tort doctrine by which an employer may
be held liable for the negligent or other tortious acts of its
agent or employee acting within the scope of his employment.
*See generally Paxton v. Crabtree*, 184 W. Va. 237, 245 n.8, 400
S.E.2d 245, 253 n.8 (1990) (citing Syllabus Point 3, *Musgrove v.
Hickory Inn, Inc.*, 168 W. Va. 65, 281 S.E.2d 499 (1981)). Here,
the Paughs have not alleged a tort action against Westfield or
Dailey on the coverage issue. Instead, the issue is one of
insurance law—if Westfield failed to make an effective offer of
optional UM/UIM coverage to the Paughs, regardless of whose
fault it was that no such offer was made, then the optional
UM/UIM coverage is included in the Umbrella Policy by operation
of law. That Westfield may or may not be able to recover from
Dailey on account of his negligence in dealing with the Paughs
is of no consequence in deciding the entirely separate issue of
the coverage.

Similarly unconvincing is Westfield's argument that Dailey

was not acting as its agent in selling the Westfield Umbrella Policy to the Paughs because he was under the control of Smith-Nadenbousch at the time the Paughs purchased the Umbrella Policy. As Westfield itself recognizes, West Virginia law defines an "insurance agent" as "an individual appointed by an insurer to solicit, negotiate, effect or countersign insurance contracts in its behalf." W. Va. Code § 33-1-12. Here, Westfield concedes that Dailey was appointed to sell Westfield policies in its behalf under § 33-1-12. (Document #125 at 16). It is also undisputed that it was Dailey who solicited the Paughs' application for the Umbrella Policy in this instance. As such, under W. Va. Code § 33-12-22, Dailey must be regarded "for all purposes" as the agent of Westfield in this controversy between it and the Paughs. *Riffe v. Home Finders Assocs., Inc.*, 205 W. Va. 216, 223, 517 S.E.2d 313, 320 (1999) (quoting *Smithson v. United States Fidelity & Guar. Co.*, 186 W. Va. 195, 204, 411 S.E.2d 850, 859 (1991)); *accord American Equity Ins. Co. v. Lignetics, Inc.*, 284 F. Supp. 2d 399, 407 (N.D. W. Va. 2003) ("Section 33-12-22 of the West Virginia Code specifically establishes that a person who solicits an application for insurance is the agent of the insurer, not the insured."). In sum, the Paughs rejected the UM/UIM coverage they desired in the

Umbrella Policy in reliance on Dailey's misrepresentation that Westfield would not issue the Umbrella Policy to them if they did not reject such coverage. Accordingly, Westfield is estopped by its agent's misrepresentations from denying optional UM/UIM coverage to the Paughs under the Umbrella Policy.

## V.  CONCLUSIONS

For the reasons expressed herein, the Court concludes that the Defendant Paughs' Motion for Summary Judgment should be granted and that Plaintiff Westfield's Motion for Summary Judgment should be denied and that the Paughs are entitled to 1 million dollars of umbrella UM/UIM coverage applicable to the May 29, 2002, accident. The Court's conclusion is based upon two (2) independent legal theories (1) Westfield's failure to comply with its statutory obligation (W.Va. Code §33-6-31) to make an effective offer of UM/UIM coverage to the Paughs and (2) coverage by estoppel based on misrepresentations of Westfield's agent. The Court, therefore, **ORDERS**:

1.  That Westfield Insurance Company's Motion for Summary Judgment (The Paughs' Claims) **(Document #119)** is DENIED;

2.  That Paughs' Motion for Summary Judgment Against Westfield Insurance Company on Coverage Issue

**(Document #117)** is GRANTED;

3.    That judgment in favor of Defendants, Scott Paugh and
      Susan Paugh, against Plaintiff Westfield Insurance
      Company be granted consistent with the Court's
      findings and conclusions herein above.

The Clerk is directed to transmit copies of this Order to
all counsel of record herein.

**ENTERED** this 26TH day of September, 2005.


W. CRAIG BROADWATER
UNITED STATES DISTRICT JUDGE